413 A.2d 411

**A. Clyde BEDILLION and Mary Bedillion, his wife**

**v.**

**W. A. WILSON STAVE COMPANY, INC. and M. F. Wilson and Dana Wilson, Appellants.**

Superior Court of Pennsylvania.

Argued April 11, 1979.

Filed Oct. 26, 1979.

James Hook, Waynesburg, for appellants.

R. Wallace Maxwell, Waynesburg, for appellees.

Before VAN der VOORT, SPAETH and WATKINS, JJ.

SPAETH, Judge:

This is an appeal from a decree in equity, granting appellees specific performance of an agreement of sale provided they pay an outstanding balance of $1,464; declaring appellee A. Clyde Bedillion owner of five shares of appellant W.A. Stave Company, Inc.; and ordering an accounting. The chancellor's findings of fact may be summarized as follows.

In March 1964 the W.A. Stave Company owned two tracts of land in Greene County. W.A. Wilson was President of the company, and his wife, appellant M.F. Wilson, was Secretary-Treasurer. Mrs. Wilson's brother, appellee A. Clyde Bedillion, was an employee of the company. On March 17, 1964, the company entered into a contract with A. Clyde Bedillion and his wife, appellee Mary Bedillion, for the sale of the two tracts. The contract provided for a purchase price of $4,500, payable $50 per month, with a ninety day grace period each year, "but in any instance, a total of $600 a year to be paid, at the interest rate of six percent (6%)." The company was to pay taxes, insurance, and interest, and deduct them from appellee's yearly payments, and was "to furnish a warranty deed if upon payment in full of [the] agreement on or before March 1, 1967."

In February 1969 the balance due was $4,368.60. On January 12, 1974, the company conveyed the two tracts to W.A. Wilson and his son, appellant Dana Wilson. W.A. Wilson died shortly thereafter. At the time the tracts were conveyed to W.A. and Dana Wilson, appellees were making payments of $60 per month, and they continued doing so until May 1975. Also, A. Clyde Bedillion performed services for the company, for which the chancellor found he was entitled to a credit of $1,673.99. In deciding how much appellees owed toward the purchase price of the two tracts, the chancellor found:

3.  Payments were made by checks and services in the amount of Three thousand eight hundred ninety-three dollars and ninety-nine cents ($3893.99).

4.  There is an unknown amount of balance remaining over and above the difference between the balance due as of February of 1969, of Four thousand three hundred sixty-eight dollars and sixty cents ($4368.60), and the credits applied for payments and services, which the Court sets at One thousand dollars ($1000.00), recognizing it is an arbitrary figure.

Record at 180a.

Finally, the chancellor found that appellees owed the company no rent—apparently a reference to the company's counterclaim that rent was owed for appellees' use of the two tracts as tenants.

■■■ It is axiomatic that "[a] chancellor's findings of fact, when approved by the *court en banc,* have the force and effect of a jury verdict and will not be disturbed on appeal if supported by adequate evidence. [Cites omitted.] . . . The same standards control in those situations where [as was the case here] the *court en banc* consists only of the chancellor himself." *Cowen v. Krasas,* 438 Pa. 171, 173, 264 A.2d 628, 629 (1970); *see also In Matter of Estate of McKinley,* 461 Pa. 731, 337 A.2d 851 (1975). The chancellor's findings are entitled to particular weight where the credibility of witnesses must be determined. *See Felmlee v. Lockett,* 466 Pa. 1, 351 A.2d 273 (1976); *Hankin v. Goodman,* 432 Pa. 98, 246 A.2d 658 (1968).

■■ Our review of the record discloses that generally, the chancellor's findings are supported by adequate evidence. This, however, does not end our inquiry, for we have concluded that the chancellor has omitted to make findings essential to the resolution of certain of the legal issues. We shall therefore remand for further findings. *See Frowen v. Blank,* 242 Pa.Super. 276, 363 A.2d 1267 (1976).

■■ One issue we find ourselves unable to resolve is whether appellees' failure to make timely payments on the

contract, as shown by the chancellor's finding of the outstanding balance of February 1969, discharged the W.A. Wilson Stave Company from its duty to convey the two tracts to appellees, thereby enabling it to convey them to W.A. and Dana Wilson, in 1974.[1]

In *Carsek Corporation v. S. Schifter, Inc.*, 431 Pa. 550, 558, 246 A.2d 365, 369 (1968), the Supreme Court said: "This court has always sought to avoid forfeitures, and has interpreted contracts in such a way as to effectuate that purpose. [Citations omitted.] Particularly is this so where there has been part performance." *Accord Barraclough v. Atlantic Refining Co.*, 230 Pa.Super. 276, 326 A.2d 477 (1974). In *Schlein v. Gross*, 186 Pa.Super. 618, 625, 142 A.2d 329, 333 (1968), this court said that "[o]nly material failure of performance by one party discharges the other. An immaterial failure does not operate as such a discharge." (Citing The Restatements of Contracts § 399(1)). And in *Shumaker v. Lear*, 235 Pa.Super. 509, 512, 345 A.2d 249, 252 (1975), we noted that in a contract for the sale of real property, time is not of the essence unless expressly so stipulated. Of particular relevance to this case is *Knable v. Bradley*, 430 Pa. 153, 242 A.2d 224 (1968). There, the contract called for a consideration of $1275, to be paid in installments of $15 each month. The contract was signed in 1958 and settlement was to be made on or before March 1, 1965. For two years, the purchasers, the Knables, faithfully performed the contract. Thereafter, payments were made and accepted at irregular intervals. After the 52nd month, no payments were made. No complaint was heard from the sellers, the Bradleys, at this point. Eight months later, when the Knables again began making payments, the Bradleys for the first time declared that "the agreement was off." However, the Bradleys continued to allow the Knables to pay the real estate taxes, and in no way disturbed the Knables' possession. The Knables then tendered the full purchase price, but the

1. If appellees defaulted on the contract so as to effect a material breach, the company was under no duty to hold the tracts for them indefinitely. *See Wasserman v. Steinman*, 304 Pa. 150, 155 A. 302 (1931); *Sanders v. Brock*, 230 Pa. 609, 79 A. 772 (1911).

Bradleys refused to execute a deed in their favor. The Court held that the Knables were entitled to specific performance of the contract, notwithstanding their late payments. It came to this conclusion because time was not of the essence, and because of the attitude of the Bradleys. Specifically, the Court noted that "[f]rom the strict legal standpoint the creditor is entitled to enforce the forfeiture according to the terms of the contract, but *equity,* or a court administering equitable principles under legal forms, will not permit him to do so if by lulling the debtor into a false sense of security he has led him into a default which otherwise the debtor might have avoided. . . . Prior indulgence by the creditor does not give the debtor an automatic right to an extension, but merely a reasonable opportunity to perform *provided* he can show that additional time would enable him to do so. A court of equity will relieve the debtor only upon paying his debt." 430 Pa. at 157, 242 A.2d at 226 (*quoting* from *Warren Tank Car Co. v. Dodson,* 330 Pa. 281, 285, 286, 287, 199 A. 139, 141 (1938)). The Court also observed that the Bradleys' unwillingness to allow continued performance by the Knables was particularly unjust because it occurred almost two years prior to the settlement date.

Here in his opinion accompanying the findings the chancellor says that the contract "had a completion date in 1967." Record at 177a. However, this is not entirely clear, for given the date of the contract (March 17, 1964) and the payment provisions ($600 per year plus interest, insurance, and taxes), it is evident that the parties contemplated that performance would not be completed until much later than 1967. A careful examination of the parties' conduct, as in *Knable,* was therefore necessary. It will be sufficient to cite one example of such conduct. M.F. Wilson testified that in February 1969 she and her husband had shown appellees a statement of the outstanding balance on the contract, and told them that the contract was terminated. Record at 109a, 130a. Both appellees acknowledged that they were shown the balance on the contract but Mr. Bedillion said he

did not remember anyone telling him that the contract was terminated, and Mrs. Bedillion said no one had ever indicated to her or her husband that it had been terminated. N.T. 50a, 68a. Clearly, before deciding whether the company had a right to convey the tracts to W.A. and Dana Wilson, it is important to know whether there was or was not notice of termination for failure to pay as required by the contract. Equally clearly, this presents an issue of credibility that only the chancellor is able to resolve. *See Felmlee v. Lockett, supra.*

A second issue we find ourselves unable to resolve is the propriety of the chancellor's computation of the amount due on the contract. This issue has several aspects.

Included in the chancellor's findings is the conclusion that services performed by A. Clyde Bedillion were an acceptable form of performance of the contract. This would seem to be a substantive modification of the terms of the contract, as the only consideration specified was monetary. In *Crown v. Cole*, 211 Pa.Super. 388, 392, 236 A.2d 532, 534 (1967), we said "[a] written agreement can be modified by a subsequent oral agreement provided the latter is based upon a valid consideration and is proved by evidence which is clear, precise, and convincing."

The record as it stands now suggests that appellees made payments of $60 per month beginning in 1972 and ending in 1975. The chancellor states that these payments were "on the property", Record at 180a (in passing, it may be noted that there are no findings with respect to the period between 1969, when appellees were informed of the outstanding balance, and 1972), and he includes them in his calculation of what had been paid on the contract, *id.* Yet it would seem that these payments themselves represent modifications of the original contract, which called for payments of $50 per month, so that an agreement to modify should have been clearly proved. *Crown v. Cole, supra.*

A. Clyde Bedillion testified that the late W.A. Wilson had instructed him to increase the monthly payments to $60.00. Record at 26a. M.F. Wilson testified that the agreement

was that appellees would "start paying an amount of sixty dollars a month rent which they agreed to do." Record at 109a. In this regard, it may be noted that on cross-examination, Mr. Bedillion said he could not explain why the $60 checks were made out to W.A. Wilson or M.F. Wilson, instead of to the W.A. Wilson Stave Company. Record at 49a. Also, Mrs. Bedillion acknowledged that the word "rent" appeared on at least one of the checks; she said however, that it was in M.F. Wilson's handwriting. Record at 70a. Two checks were ripped, apparently so that any notation of what they represented had been destroyed. Mrs. Bedillion said her son had ripped them in play. *Id.* Again, it would seem that an issue of credibility is presented.

Assuming that the contract was modified, both to permit payments in the form of services and also at the rate of $60 per month, still we find ourselves unable to accept the chancellor's fourth finding, that "[t]here is an unknown amount of balance remaining . . . which the Court sets as One thousand dollars . . ., recognizing it is an arbitrary figure." Record at 180a. It is not clear to us what the chancellor meant by "arbitrary." It is appellees who seek specific performance. It was therefore their burden to prove that they were entitled to it.

■ Finally, we find ourselves unable to resolve appellants' claim that appellees were guilty of laches.[2] In *Dorsch v. Jenkins*, 243 Pa.Super. 300, 307, 365 A.2d 861, 864 (1976), we stated that "[t]he application of the equitable doctrine or laches does not depend upon the fact that a certain definite time has elapsed since the cause of action accrued, but

---

**2.** We note that here the record suggests that appellees were in possession of the land for most of the period. Record at 109a. As a general rule laches will not be imputed to one in possession, for his possession is notice to all of his claim to equitable rights. *Stolarick v. Stolarick*, 241 Pa.Super. 498, 363 A.2d 793 (1976). Nevertheless, there appears to be an exception to this rule. In *Richards v. Elwell*, 48 Pa. 361, 366–67 (1864), there is dictum that "[h]ad the possession been fiduciary, by reason of non-payment of purchase-money, or some unperformed duty, or had some right of the vendor remained to be protected which in equity required the purchaser to be prompt, eager, and active, it might be different."

whether under the circumstances of the particular case, the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice." (*Citing Holiday Lounge Inc. v. Shaler Enterprises Corporation,* 441 Pa. 201, 205, 272 A.2d 175, 177 (1971)). Here the chancellor dismissed the claim of laches because "there was no injury to the seller as a result of the delay." Record at 178a. We note, however, that appellants had to try the case without being able to call W.A. Wilson, who was a principal to the original contract and all of its suggested modifications, which would not have been so had the action been brought several years earlier, before his death. *See McGrann v. Allen,* 291 Pa. 574, 140 A. 552 (1928); *Kinter v. Commonwealth Trust Co. Exr. et al.,* 274 Pa. 436, 118 A. 392 (1922). Yet, we cannot decide on the basis of the present findings whether appellees' failure to bring the action sooner reflected a lack of "due diligence." *See generally, Height Land Co. v. Swengel's Est.,* 319 Pa. 298, 179 A. 431 (1935); *Stewart's Estate,* 278 Pa. 318, 123 A. 287 (1924). Much again will depend on the parties' respective conduct. While it might be unfair to permit appellees to recover if by their conduct they led appellants to believe that they had abandoned any claim on the contract, it would also be unfair to deny appellees recovery by reason of laches if appellants by their conduct led appellees to believe that they would not have to proceed to court for specific performance. *See Jones v. Gravity Filling Service Station,* 361 Pa. 198, 64 A.2d 490 (1949).

By remanding we do not intimate an opinion regarding the correctness of the chancellor's final decree, nor do we mean to imply by any of the comments we have made what we think the chancellor's further findings should be. The extent of our decision is only to hold that given the findings we have we are unable to resolve the legal issues we have mentioned. We hope that our discussion of these issues has indicated the nature, but not the content, of the further findings needed if we are to be able to resolve these issues. We leave it to the chancellor and the parties to decide

whether, to enable the chancellor to make such further findings, another hearing will be required.

Reversed and remanded for further proceedings consistent with this opinion.